UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| MICHAEL B. DELTITO | : | |
| Debtor | : | Bankruptcy No. 05-11422F |
| _____ | | |
| MICHAEL B. DELTITO | : | |
| Plaintiff | : | |
| v. | : | |
| UNIVEST NATIONAL BANK AND TRUST CO. | : | |
| Defendant | : | Adversary No. 05-0441 |
| _____ | | |

.................................................

MEMORANDUM

.................................................

On February 4, 2005, the debtor, Michael B. Deltito, filed a voluntary petition in bankruptcy under chapter 13.  On March 7, 2005, he filed a proposed chapter 13 plan.  Univest National Bank and Trust Co. ("Univest") filed a secured proof of claim in this case as well as an objection to confirmation of the debtor's plan.  The debtor, in turn, on June 30, 2005, filed the above-captioned adversary proceeding.

In his complaint, the chapter 13 debtor alleges that Univest holds a claim secured by real property owned by the debtor as well as by real property owned by a non-debtor, known as MAV Associates, L.P.  He further asserts that the value of the MAV property is sufficient either to repay Univest in full or to substantially reduce its secured claim in this case.  In his prayer for relief, the debtor requests that this court: "fix the

amount of the defendant's secured claim; and/or disallow the claim or, in the alternative, allow it in part after taking into consideration the amount to be received through the liquidation of the MAV real estate."

In its answer, Univest avers that the "Debtor has alleged that there are environmental problems on the MAV property which make it unmarketable or of very little value." As a result, the defendant asserts that "[i]t is inappropriate to consider the MAV Property in determining the amount of Univest's claim against the Debtor as the net realizable value of the MAV Property, if anything, is indeterminable at this time." Univest requests in its answer that its secured claim be allowed in the amount "equal to the value of the Debtor's primary residence . . . less the amount of any liens which prime Univest's liens."

According to these pleadings, the debtor was challenging the amount of Univest's secured claim in his bankruptcy case, asserting that this claim should be reduced by the value of the MAV realty. Univest responded that the MAV realty may have no value and thus should not be considered. The defendant did acknowledge in its answer, however, that its allowed secured claim would not exceed the value of the debtor's realty, less any liens that primed Univest's lien. Answer, ¶ 23.

In August 2005, notice was issued that this adversary proceeding was scheduled for trial on November 17, 2005. On the literal eve of trial, and repeated at trial in his opening remarks, debtor's counsel sought an adjournment. He argued that Univest had foreclosed on the MAV realty in October 2005 and "[t]he bank has already told us they have interested parties who will pay pretty much the entire debt off . . . ." N.T. at 3. The plaintiff sought a continuance of the trial on his complaint to await Univest's private

2

sale of the MAV realty, which he believed would satisfy most, if not all, of the claim against him. Univest's counsel, however, opposed any postponement of trial. N.T. at 6. In light of defendant's opposition and the presence of witnesses, I sustained Univest's objection and denied the last-minute postponement request.[1]

The following facts were thereafter proven.

I.

Upon commencing his voluntary bankruptcy petition under chapter 13, Mr. Deltito filed the required bankruptcy schedules. On these schedules, he disclosed his ownership interest in 113 Rugby Drive, Langhorne, Pennsylvania, which is his residence.[2] He also disclosed a first mortgage lien held by Wells Fargo Bank and a second mortgage claim on the residence held by Univest. Mr. Deltito further identified an ownership interest in several business entities: MAV Associates, LLC; MAV Associates, LP; and Precision Fleet Industrial Service. Id., Schedule B. He is president of MAV Associates, LLC, which is a general partner of MAV Associates, LP. N.T. at 11; Complaint, ¶ 6.

---

[1] The execution sale on the MAV property took place about 30 days prior to the scheduled trial and counsel did not explain his delay in requesting a postponement, which request was based upon this sale.

[2] I take judicial notice, under Fed. R. Evid. 201 (incorporated into bankruptcy cases by Fed. R. Bankr. P. 9017), of the docket entries and bankruptcy schedules of this case. See Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1200 n.3 (3d Cir. 1991); Levine v. Egidi, 1993 WL 69146, at *2 (N.D. Ill. 1993); In re Paolino, 1991 WL 284107, at *12 n.19 (Bankr. E.D. Pa. 1991); see generally In re Indian Palms Associates, Ltd., 61 F.3d 197 (3d Cir. 1995). The information in the schedules is hearsay, however, and not accepted for the truth of the debtor's assertions; only that such assertions were made. See In re Indian Palms Associates, Ltd., 61 F.3d at 205; In re Aughenbaugh, 125 F.2d 887, 890 (3d Cir. 1942).

The latter entity owns property located at 2177 Bennett Road, Philadelphia, Pennsylvania.  N.T. at 11; Complaint and Answer, ¶ 6.  MAV financed the purchase of the Bennett Road property through the defendant's predecessor.  Complaint and Answer, ¶ 7; Defendant's Ex. A (promissory note).  As collateral for the $350,000 note, executed on January 28, 2000, MAV Associates, LP granted a mortgage on the Bennett Road property, and the debtor and his spouse, as sureties, granted a mortgage on their Rugby Drive residence.  N.T. at 12; Complaint and Answer, ¶ 8; Defendant's Ex. A.  The Bennett Road property is an industrial property consisting of approximately 16,000 square feet of building area.  Ex. P-1, at 1.

Univest confessed judgment on the promissory note on January 20, 2004, in the Court of Common Pleas of Bucks County for approximately $402,000, against MAV and the debtor.  Defendant's Ex. B; N.T. at 25, 41-42.[3]  MAV Associates, LP later filed a bankruptcy petition under chapter 11 on February 25, 2005, docketed at Bankr. No. 05-12491, and that case was assigned to my colleague, Judge Stephen Raslavich.

MAV's chapter 11 case was converted to chapter 7 on October 27, 2005.  Bankr. No. 05-12491, docket entry #45.[4]  On June 16, 2005, Judge Raslavich granted Univest's motion for relief from the automatic stay in the MAV case, thereby permitting that creditor to exercise its state law rights to execute upon the Bennett Road property.  Bankr. No. 05-12491, docket entry #30.

---

[3]I have relied upon the testimony at trial for the amount of the judgment, rather than the figure mentioned in the proof of claim.

[4]Again, I take judicial notice of the docket entries in the MAV bankruptcy case.

4

The testimony reflects that an execution sale was conducted by the Sheriff of Philadelphia County on October 4, 2005, at which Univest "credit bid" its claim and purchased the property. N.T. at 47-48. Univest has not resold the property. Id. Indeed, as of the trial date, the sheriff had not yet issued a deed to Univest, N.T. at 7, 47, and MAV Associates, LP remained in possession of the property (of course, subject to ejectment). N.T. at 49.

In the proof of claim filed by Univest in Mr. Deltito's case on July 20, 2005, Univest asserted a total secured claim of $372,045.28.[5] Defendant's Ex. B. The proof of claim itemizes the following amounts due:

| | |
|---|---|
| principal | $323,048.40 |
| accrued interest | 30,217.81 |
| late charges | 1,485.50 |
| other charges/fees | 1,050.00 |
| attorneys' fees and costs | 16,243.57 |
| TOTAL | $372,045.28 |

Id. The itemization was computed as of February 4, 2005, the date of commencement of the chapter 13 case, except for the interest component, which was calculated to July 14, 2005 at a per diem rate of $107.68. Id.[6]

Univest prepared, at the request of debtor's counsel, a loan payoff calculation in the amount of $399,885.51 as of August 18, 2005. Ex. P-3. The principal amount due remained $323,048.40, with $33,986.71 then claimed due as interest,

---

[5]No explanation was given for why the proof of claim amount is less than the confessed judgment entered 17 months earlier.

[6]I have taken judicial notice of the proof of claim filed by Univest in the MAV bankruptcy case. This secured claim, dated March 1, 2005, asserted that $353,195.49 was due and owing. As this claim is less than Univest asserted in the Deltito bankruptcy, I assume that the difference lies in the inclusion of postpetition interest in the latter, but not the former.

$1,634.05 in late charges, and $41,216.51 in attorney's fees.  At trial, Univest stated that it believed its claim had risen to approximately $440,441, see N.T. at 32, with the increase presumably based upon accrual of postpetition interest, late charges and counsel fees.  Univest also presented testimony that it has not received any written offers for the MAV property.  N.T. at 33.

Insofar as the value of the Bennett Road property is concerned, Mr. Deltito testified that MAV purchased that realty in 2000 for $450,000.  N.T. at 12.  Univest later obtained an appraisal stating that the property was worth $437,000 as of March 3, 2004.[7] This valuation assumed that there was no environmental contamination of the property. Ex. P-2, at 3.

This March 2004 appraisal report used a comparable sales approach to valuation.  The environmental contamination issue is mentioned in the appraisal because the appraiser noticed that there had been "a test hole boring . . . located in the common driveway between the" MAV property and comparable # 1.  Comparable #1, located at 2179 Bennett Road, sold for $250,000.  The appraisal also stated that comparable property #1 was sold at a discounted cash price "due to environmental contamination and the inability to obtain bank financing."  Id.  The appraisal report, though, does not conclude that the MAV realty is actually contaminated; it suggests only that the existence of any environmental problems should be investigated.  The report also reveals that the property located at 2070 Bennett Road, which is a relatively smaller parcel and building, sold for $316,262, with no suggestion that this comparable might be contaminated.  Id.

_____

[7]This valuation purportedly matches that of an appraisal conducted at the time of MAV Associates' purchase of the property in January 2000.  N.T. at 29.

6

When MAV filed its bankruptcy case, it scheduled the value of the Bennett Road realty at $236,000. N.T. at 15. Mr. Deltito testified that this valuation had been based upon the sale price of the adjoining property. Id. He further testified that he has no knowledge of any environmental contamination on the MAV site. Id. The debtor also testified, without objection, that he spoke with the former owner of the adjoining property after filing the MAV bankruptcy schedules, who told him " that there was not [an environmental problem], and that there was other reasons that the building was sold for the value that it was sold for." N.T. at 16.

The evidence also revealed that the debtor, on behalf of MAV, entered into an agreement of sale for the MAV realty dated September 28, 2005, a few days before Univest's scheduled sheriff's sale of the property. Ex. P-2.[8] The purchase price in this agreement was $475,000, with a closing date of November 30, 2005. Id. The sales agreement, however, contains a number of contingencies, including a mortgage contingency, and a contingency that the buyer be allowed to conduct inspections for "structure, mechanicals, termite & plumbing, neglig., etc. to be completed by Oct 28, 2005, satisfactory to Buyer." Ex. P-2. It also allowed for a 30-day extension of the agreement if requested by the buyer, and a requirement that the seller lease 5,000 square feet of space at market rate. Id.

Based upon this agreement of sale (which was never consummated, due to Univest's execution on the property) and the debtor's testimony that real estate across the street from the MAV realty—which property was about the same size but had greater

---

[8]Apparently, MAV sought relief in bankruptcy court to stay the foreclosure sale based upon this last-minute sales agreement, but such relief was denied. N.T. at 28.

parking facilities—recently sold for $575,000, N.T. at 18, and another nearby smaller property sold for $525,000, id., the debtor opined that he now valued the MAV realty at $475,000. N.T. at 17. See United States v. 68.94 Acres of Land, 918 F.2d 389, 397 (3d Cir. 1990) (owner of property is competent to testify as to its value).

Univest offered no evidence of any environmental contamination of the MAV realty. Its employee from the recovery department, Mr. Leonard Boone, testified that the MAV property would minimally be worth the appraised value of $437,000. N.T. at 51; see also N.T. at 31 ("I would guess that [the appraisal] would be an accurate number").

Finally, the debtor stated that the value of his residence is $425,000, N.T. at 18, and the amount due on the existing first mortgage held by Wells Fargo is about $150,000. N.T. at 19.


II.


A.


From the pleadings, arguments of counsel, and post-trial memorandum, it appears that this adversary proceeding represents the debtor's challenge to Univest's July 20, 2005 secured proof of claim filed in the amount of $372,045.28. Moreover, the parties agree upon the general methodology by which Univest's allowed secured claim should be fixed in this proceeding.

8

The debtor maintains that the Univest secured claim in this bankruptcy case is limited to the amount he owes less the value of the MAV realty, in which the creditor now has an ownership interest due to its purchase at the execution sale.  Univest concedes that: "Following the sale of that [MAV] property, Univest should have a claim against the residence that is equal to any deficiency that remains from the sale of the MAB [sic] property."  N.T. at 55; see also 60-61 (proceeds from the MAV realty must be credited against the claim against the debtor).

In other words, Univest acknowledges that under relevant non-bankruptcy law (i.e., Pennsylvania law) it cannot be paid twice for the same loan—once by MAV and once by the debtor.  See generally In re Gimelson, 2004 WL 2713059, at *15 (E.D. Pa. 2004); Franklin Decorators, Inc. v. Kalson, 330 Pa. Super. 140, 142 (1984); Shankweiler v. Regan, 2002 WL 32096601, 60 Pa. D. & C.4th 20, 23 (Ct. Com. Pl. 2002) ("It is well established in this Commonwealth that a plaintiff is limited to one satisfaction for a single injury.").  Having already executed upon the MAV realty, Univest agrees with the debtor that its value should be subtracted from the amount owed by the debtor, with the remainder constituting its allowed secured claim.

Although the parties agree upon the method for determining the defendant's allowed secured claim, they differ on two major points.

First, the parties disagree on the amount owed by the debtor as surety. Univest asserts that it is owed about $440,000.  N.T. at 33.  The debtor at first focused upon the August 2005 payoff statement, and contended that this creditor is only owed about $400,000.  N.T. at 54.  Later, in its post-trial memorandum, the debtor argues that Univest has only proven an unpaid principal loan balance of $323,048, and that the other

9

components of its claim—i.e., interest, late charges, attorney's fees—were unproven or inconsistently asserted in the proof of claim, payoff statement and confessed judgment. Plaintiff's Memorandum, at 6.

Second, the parties differ regarding the value of the Bennett Road property. Initially, MAV valued that property at $236,000. Now, the debtor argues that the MAV property is worth $475,000, or at least $437,000, which therefore completely repays the outstanding obligation (based upon the debtor's computation of his outstanding obligation). Plaintiff's Memorandum, at 4.

Univest initially contended in its answer and at trial that the value of the MAV realty is too speculative to be quantified, due to environmental concerns. N.T. at 55. Its allowed claim should be determined solely by the value of debtor's residence, less the amount owed to the first lienholder, Wells Fargo. N.T. at 55-56. In its post-trial memorandum, it now maintains that the value found in the MAV bankruptcy schedules, $236,000 "more accurately reflects the Property's fair market value." Defendant's Memorandum, at 7. The defendant maintains that this lower amount should be subtracted from the total debt, and the balance be allowed as a secured claim against the debtor. Defendant's Memorandum, at 13-14.

B.

I shall first determine the amount owed by Mr. Deltito to Univest, based upon the evidence presented at trial, without consideration of Univest's execution upon the MAV property.

10

In general, a creditor's bankruptcy claim is determined as of the date the

bankruptcy petition was filed. 11 U.S.C. § 502(b); <u>see</u>, <u>e.g.</u>, <u>In re May Reporting Services,</u>

<u>Inc.</u>, 115 B.R. 652, 658 (Bankr. D.S.D. 1990).  Moreover, a bankruptcy court does not sit

in review of state court judgments, be they entered by confession, <u>see</u> <u>In re FRG, Inc.</u>, 919

F.2d 850 (3d Cir. 1990), by default, <u>see</u> <u>Kelleran v. Andrijevic</u>, 825 F.2d 692, 694 (2d

Cir. 1987), <u>cert. denied</u>, 484 U.S. 1007 (1988), or after trial or hearing.  <u>See</u>, <u>e.g.</u>, <u>Heiser</u>

<u>v. Woodruff</u>, 327 U.S. 726 (1946); <u>In re Brown</u>, 951 F.2d 564 (3d Cir. 1991).  As was

explained by the Third Circuit Court of Appeals:

> The bankruptcy court is also prohibited from reviewing the
> state court's judgment by the Rooker-Feldman doctrine,
> which prohibits lower federal courts from sitting as effective
> courts of appeal for state court judgments.  <u>See</u>, <u>e.g.</u>, <u>D.C.</u>
> <u>Court of Appeals v. Feldman</u>, 460 U.S. 462, 476 . . . (1983)
> (citing <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413 . . . (1923));
> <u>Besing v. Hawthorne</u> (<u>In re Besing</u>), 981 F.2d 1488, 1496 (5th
> Cir. 1993) ("The Bankruptcy Code was not intended to give
> litigants a second chance to challenge a state court judgment
> nor did it intend for the Bankruptcy Court to serve as an
> appellate court [for state court proceedings]") (quoting <u>In re G</u>
> <u>& R Mfg. Co.</u>, 91 B.R. 991, 994 (Bankr. M.D. Fla. 1988)).

<u>In re Wilson</u>, 116 F.3d 87, 90 (3d Cir 1997) (citations omitted).[9]

As of the date the debtor filed his bankruptcy petition, February 4, 2005,

Univest had already obtained a confessed judgment in the amount of $402,000, about one

year previously, on January 20, 2004.  The entry of that judgment is binding upon this

---

[9]Although there is a fraud exception to this prohibition against review of a state
court judgment—articulated in <u>Pepper v. Litton</u>, 308 U.S. 295 (1939)—this exception is very
narrowly construed.  <u>See</u> <u>Heiser v. Woodruff</u>, 327 U.S. at 736; <u>Kelleran v. Andrijevic</u>, 825 F.2d
at 694; <u>Matter of Bulic</u>, 997 F.2d 299, 305 (7th Cir. 1993).  In order for a bankruptcy court to
invalidate a prior state court judgment, there must be "fraud upon the [state] court" which caused
it to enter the judgment.  <u>See</u> <u>Matter of Bulic</u>, 997 F.2d at 305; <u>In re Laing</u>, 945 F.2d 354, 358
(10th Cir. 1991).  In connection with this objection, Mr. Deltito does not contend that the fraud
exception applies.

bankruptcy court.  Despite this judgment, Univest filed a proof of claim in this case asserting that it was owed $372,045.28, and that this figure includes post-bankruptcy interest through July 14, 2005.  Ex. B.  And then, inexplicably, it informed the plaintiff that he owed $399,855.51 as of August 18, 2005.  Ex. P-3.

Based upon the various assertions made by Univest, I find that it is likely that the debtor did not owe more than $402,000, and possibly owed less, as of the commencement of this bankruptcy case on February 4, 2005.  Had more been owed, it is unlikely that neither the proof of claim nor the payoff letter would have failed to demand a higher amount.  And had the confessed judgment been modified at all, the debtor probably would have so asserted.

After a creditor's claim is fixed as of the date of the bankruptcy filing, the claim usually does not continue to accrue post-bankruptcy interest, costs or attorney's fees.  The general rule in bankruptcy is that "interest on the debtors' obligations ceases to accrue at the beginning of proceedings."  Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 163 (1946).[10]  Accordingly, no postpetition interest accrues upon unsecured claims or, in light of section 506(b) (to be discussed below), upon

---

[10]11 U.S.C. 502(b)(2) states:

> (b) Except as provided in subsections (e)(2), (f), (g), (h) and (I) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in lawful currency of the United States in such amount, except to the extent that–
>
> (2) such claim is for unmatured interest[.]

undersecured claims.  See United Savings. Ass'n v. Timbers of Inwood Forest, 484 U.S.

365, 372-73 (1998) ("Since this provision [506(b)] permits postpetition interest to be paid

only out of the 'security cushion,' the undersecured creditor, who has no such cushion,

falls within the general rule disallowing postpetition interest.").[11]

     Likewise, an unsecured creditor or an undersecured creditor is not entitled

to recover postpetition fees and costs arising from his claim.  See, e.g., In re Loewen

Group International, Inc., 274 B.R. 427, 444 (Bankr. D. Del. 2002) ("[L]ike post-petition

interest, post-petition fees and costs may only be recovered by creditors to the extent their

claims are oversecured."); In re Woodmere Investors Ltd. Partnership, 178 B.R. 346, 356

(Bankr. S.D.N.Y. 1995) ("If no 'security cushion' exists to allow for post-petition

interest, none exists for the allowance of attorney fees and costs."); In re Saunders, 130

B.R. 208, 214 (Bankr. W.D. Va. 1991) ("An undersecured or unsecured creditor cannot

recover contractual attorneys' fees for work performed postpetition.").

     The exception to the principle that creditor claims do not accrue post-

bankruptcy fees, interest and costs is found in the provisions of 11 U.S.C. § 506(b).  An

oversecured creditor—defined as one holding a claim where the value of the collateral

exceeds the amount owed— is entitled to postpetition interest, costs and fees pursuant to

§ 506(b), which provides:

> To the extent that an allowed secured claim is secured by
> property the value of which, after any recover under
> subsection (c) of this section, is greater than the amount of
> such claim, there shall be allowed to the holder of such claim,

---

[11]Section 726(a)(5) creates an exception to this general rule when all creditors will
be paid in full.  See, e.g. In re Coram Healthcare Corp., 315 B.R. 321, 343-44 (Bankr. D. Del.
2004) (allowing the payment of postpetition interest to undersecured creditors before making a
distribution to the equity holders).

13

interest on such claim, and any reasonable fees, costs, or
charges provided for under the agreement under which such
claim arose.

Thus, only an oversecured creditor is entitled to post-bankruptcy interest,
attorney's fees and costs. See, e.g., United Savings Association of Texas v. Timbers of
Inwood Forest Associates, Ltd., 484 U.S. at 372-73. The claimant bears the burden of
demonstrating that his claim is oversecured and thus entitled to postpetition interest, costs
and fees. E.g., In re Schriock Construction, Inc., 104 F.3d 200, 201 (8th Cir. 1997); In re
McCoy, 163 B.R. 206, 211-12 (Bankr. M.D. Fla. 1994); In re Grabill Corp., 121 B.R.
983, 991 (Bankr. N.D. Ill. 1990).

A creditor is considered oversecured by section 506(b) only "to the extent
that the value of [his] interest in the estate's interest in property is greater than the amount
of the creditor's allowed prepetition claim." 4 Collier on Bankruptcy ¶ 506.04 (15th ed.
rev. 2004). Therefore, "[u]nder this provision, an oversecured creditor is entitled to
postpetition interest on its claim only 'to the extent that such interest, when added to the
principal amount of the claim,' does not 'exceed the value of the collateral.'" Rake v.
Wade, 508 U.S. 464, 468 n.4 (1993) (quoting United Savings Association of Texas, 484
U.S. at 372).

If one considers only the debtor's residence as collateral, as Univest initially
argued, then this creditor would not be oversecured. The only evidence concerning the
value of the debtor's residence came from the debtor's testimony that the Rugby Drive
property was worth $425,000 and the amount due Wells Fargo, the first mortgage holder,
was $150,000. For purposes of applying section 506(b), one must subtract prior liens.
See generally In re Indian Palms Associates, Ltd., 61 F.3d 197 (3d Cir. 1995).

14

Subtracting the Wells Fargo lien from the value of the Rugby Drive property leaves

equity of only $275,000.  This equity is less than the amount owed to Univest, rendering

that creditor undersecured.

In its post-trial memorandum, Univest asserts that it is oversecured because

the MAV property, which it values at $236,000, also serves as collateral for its loan.

Defendant's Memorandum, at 10.  Adding the Rugby Drive and Bennett Road

values—$425,000 plus $236,000 totals $661,000—and subtracting the Wells Fargo

lien—$150,000—yields $511,000 in equity.  This equity is considerably greater than the

defendant's prepetition claim of no more than $402,000.[12]

Recently, however, the Third Circuit Court of Appeals disagreed with

Univest's interpretation of section 506(b) (in a non-precedential decision).  In re DeNofa,

124 Fed. Appx. 729 (3d Cir.), cert. denied sub nom. National Loan Investors, L.P. v.

Denofa, 126 S. Ct. 345 (2005).  In Denofa, the lender, who had made a loan to a

corporation that was guaranteed by the debtors and a third-party, held mortgages against

both the debtors' residence and the residence of the non-debtor third-party.  The Court of

Appeals addressed "whether non-debtor property may be included in determining whether

a debt is oversecured."  Id. at 730.  The appellate court answered that question by holding:

---

[12]The restrictions of section 506(b) may explain the modification in Univest's
position regarding the value of the MAV collateral from its answer and argument at trial—no
value—and its post-trial assertion of $236,000.

It is Univest's contention that, for purposes of determining whether it is
oversecured, one must add the value of the Bennett Road property to the Rugby Drive property to
the determine the extent of its collateral.  As will be discussed, this premise is incorrect.  But if
this position were valid, and if the MAV realty were treated as having no value, then Univest
clearly is undersecured and not entitled to post-bankruptcy interest, costs and fees.  However, if
the MAV property is given a value greater than the amount of the Wells Fargo first mortgage, but
far less than the amount of the prepetition claim, then the creditor might be able to utilize section
506(b) and be entitled to accrue post-bankruptcy interest, costs and fees.

> Thus, quite plainly, the "allowed secured claim" of NLI that
> we must examine for purposes of post-petition interest under
> § 506(b) is limited to the extent of the value of the property of
> the DeNofas' bankruptcy estate which secures it.

Id. at 731 (citing 5 Collier on Bankruptcy ¶ 506.04[1] (15th rev. ed. 2003)); see also In re

Tomlinson, 116 B.R. 80 (Bankr. E.D. Mich. 1990) (for purposes of determining chapter

13 eligibility under section 109(e), a claim secured only by non-estate property is an

unsecured claim); In re Heyer, 13 B.R. 610, 613 (Bankr. E.D. Va. 1981); see generally In

re Paul, 83 B.R. 709, 713 (Bankr. D.N.D. 1988) ("Thus, a creditor's secured claim is

limited by the amount of the value of the estate's interest in the collateral.  See 3 Colliers

on Bankruptcy ¶ 506.04 (15th ed. 1987).  If the estate has no interest in specific property,

a creditor does not receive a secured claim in the amount of the value of the property.").

In other words, when considering whether a creditor is oversecured for

purposes of applying the exception found in section 506(b), the Third Circuit concluded

that Congress intended that only the value of the debtor's property be considered.  The

value of non-debtor property cannot be added to render the creditor oversecured.

Based upon the evidence offered, and given that it had the burden of

persuasion under section 506(b), see, e.g., In re Oliver, 183 B.R. 87, 92 (Bankr. W.D. Pa.

1995) ("The creditor carries the burden of proof of showing that it is oversecured."),

Univest did not prove that it is oversecured.  The value of the debtor's residence, less the

amount due the first lienholder, was less than the amount due Univest at the

commencement of this bankruptcy case.  Therefore, Univest's allowed claim at the time

of trial did not exceed its prepetition claim, estimated not to exceed $402,000.  Since

Univest is an undersecured creditor in this case, its claim cannot increase post-bankruptcy

by the accrual of interest and attorney fees.

16

C.

In determining the second issue—the value of the MAV realty—I must also consider the allocation of the burden of persuasion.

If this proceeding is viewed as the debtor's objection to Univest's allowed secured claim, then the plaintiff/debtor has an initial burden of production, but the ultimate burden of persuasion falls upon the defendant/creditor.  As explained by the Third Circuit Court of Appeals in In re Allegheny International, Inc., 954 F.2d 167, 173-74 (3d Cir. 1992):

> The burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. § 502(a) rests on different parties at different times.  Initially, the claimant must allege facts sufficient to support the claim.  If the averments in his filed claim meet this standard of sufficiency, it is "prima facie" valid.  In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward.  The burden of going forward then shifts to the objector to produce evidence sufficient to negate the prima facie validity of the filed claim.  It is often said that the objector must produce evidence equal in force to the prima facie case.  In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.  If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.  The burden of persuasion is always on the claimant.

Id. (citations omitted).

Disputes concerning allowed secured claims involving the value of collateral under 11 U.S.C. § 506(a) have the same allocation of the evidentiary burdens:

> General principles governing the effect of a proof of claim convince us that, under the facts of this case, Agricredit had

17

> the burden of filing the motion to value [its collateral]. Its
> proof of claim was prima facie evidence as to the validity and
> amount of the claim. Bankr.R. 3001(f).  Its claim was deemed
> allowed because no objection was filed.  Section 502(a). If an
> objection had been filed, Agricredit would have had the
> burden of persuasion as to the validity and amount of the
> claim. . . . We conclude that Agricredit had the burden of
> accurately setting forth the nature of its claim in its proof of
> claim and of correcting its claim through an amended or
> supplemental proof of claim or a motion to value under §
> 506(a) and Bankr.R. 3012.

In re Harrison, 987 F.2d 677, 681 (10th Cir. 1993) (citation omitted); see Matter of 183

Lorraine Street Associates, 198 B.R. 16, 26 (E.D.N.Y. 1996) ("The valuation of a claim

secured by property necessarily requires a valuation of the property securing such a claim.

'If an objection is made to the proof of claim, the creditor has the ultimate burden of

persuasion as to the validity and amount of the claim.'") (quoting Harrison, 987 F.2d at

680).

Thus, disputes involving objections to secured claims based upon the value

of collateral under section 506(a) involve an initial burden of production upon the

objector.  If the objector meets that burden, the ultimate burden of persuasion falls upon

the creditor.  See In re Roberts, 210 B.R. 325, 331 (Bankr. N.D. Iowa 1997) (debtor failed

to meet her burden of production); In re Southmark Storage Associates Ltd. Partnership,

130 B.R. 9, 10 (Bankr. D. Conn. 1991):

> The debtor bears the initial burden of overcoming the
> presumption that the amount of Prime Plus' secured claim is
> as stated in its proof of claim, but the ultimate burden of
> persuasion is upon Prime Plus to demonstrate by a
> preponderance of the evidence the value of the collateral
> which secures its claim.

Univest in its post-trial memorandum likens this dispute to the

determination of a deficiency judgment under Pennsylvania's Deficiency Judgment Act

18

("DJA"), 42 Pa. C.S.A. § 8103, following its execution upon the MAV property, rather than as an objection to an allowed secured claim under section 506. The defendant reasons that the plaintiff—by asserting that Univest's allowed claim now must be offset by the value of the MAV realty, due to the creditor's post-bankruptcy execution upon a judgment—is implicitly invoking state law, specifically the DJA. See In re Romano, 175 B.R. 585, 600 (Bankr. W.D. Pa. 1994) ("[T]he parties obviously desire to have the first proof of claim determined in accordance with the provisions of the Deficiency Judgment Act."). Moreover, the defendant observes that the Third Circuit Court of Appeals has held that, in appropriate circumstances, a bankruptcy court has the power to determine the amount of any deficiency judgment. See In re Zinchiak, 406 F.3d 214 (3d Cir. 2005); see also In re Jarjisian, 314 B.R. 318 (Bankr. E.D. Pa. 2004).

As Univest notes, the DJA requires that the foreclosing creditor reduce its claim by the value of the property foreclosed upon. See In re Zinchiak, at 220 n.5; In re Romano, 175 B.R. at 600. The plaintiff does appear to seek such an offset. If the DJA applies to this proceeding, I note that this state statute is construed in favor of the judgment debtor. See, e.g., First Federal Savings & Loan Association v. Keisling, 746 A.2d 1150, 1155 (Pa. Super. 2000); Cheltenham Federal Savings and Loan Assoc. v. Pocono Sky Enterprises, Inc., 305 Pa. Super. 471 (1982). Among its provisions is the irrebuttable presumption that the value of the foreclosed-upon property equals the amount of the underlying debt, unless the judgment creditor seeks to value the property sold within six months of the sheriff sale. See First Federal Savings & Loan Association v. Keisling, 746 A.2d at 1157.

19

If a judgment creditor requests a valuation of the real property recovered by it upon execution, and if that value is less than the amount due that creditor, it may obtain a deficiency obligation.  Once a court determines the fair market value:

> the debtor shall be released and discharged of such liability to the judgment creditor to the extent of the fair market value of said property determined by the court, less the amount of all prior liens, costs, taxes, and municipal claims not discharged by the sale, and also less the amount of any such items paid at the distribution on the sale, and shall also be released and discharged to extent of any amount by which the sale price, less such prior liens, costs, taxes, and municipal claims, exceeds the fair market value as agreed to by the judgment creditor or fixed and determined by the court as provided in this subsection, and thereupon the judgment creditor may proceed by appropriate proceedings to collect the balance of the debt.

42 Pa. C.S.A. § 8103(c)(5).

Since the DJA is construed in favor of the judgment debtor, and because the judgment creditor has the responsibility to petition the court to fix the value of the property sold, the evidentiary burden falls upon the creditor to establish that the value of the property was less than the amount owed.  See generally First Federal Savings & Loan Association v. Keisling, 746 A.2d at 1154 ("The judgment creditor must carry the burden to demonstrate its compliance with the Deficiency Judgment Act.").

Accordingly, whether this proceeding is viewed as one under the DJA, or as an objection to a proof of claim, or as an action to determine an allowed secured claim under section 506(a), the defendant Univest had the ultimate burden to establish the value of the MAV realty.  The plaintiff though may have had an initial burden of production on the issue of value.

20

D.


The fair market value of real property in connection with the DJA is

measured by "the amount a purchaser, willing but not obligated to buy the property,

would pay to an owner willing but not obligated to sell."  United States v. Branch Coal

Corp., 285 F. Supp. 514, 517 (E.D. Pa. 1968); Confederation Life Ins. Co. v. Morrisville

Properties, L.P., 715 A.2d 1147, 1154 (Pa. Super. Ct. 1998); Bryn Mawr Trust Co. v.

Healy, 446 Pa. Super. 501, 508 (1995).  The Pennsylvania Supreme Court has stated that:

> [m]any elements properly enter into the determination of "fair
> market value."  Among these are recent sales of real estate of
> comparable location and description . . . .  Other factors of
> value include (1) the uses to which the property is adapted and
> might reasonably be applied . . . (2) the demand for the
> property and similar properties, taking into consideration
> economic conditions which depress market value in its true
> sense and detrimentally influence such demand . . . (3) the
> income produced by the property, including rents, and (4)
> generally, all elements which affect the actual value of
> property and therefore influence its fair market value . . . .

Union Nat'l Bank v. Crump, 349 Pa. 339, 343 (1944); see First Pennsylvania Bank v.

Peace Valley Lakeside Community and Agricultural Trust, Inc., 329 Pa. Super. 218, 224

(1984) (considering that the city was not likely to reject the application for a zoning

change).

A professional appraisal of the property is not required under the DJA,

although the existence of such an appraisal can be relied upon by a court in fixing the fair

market value of the property sold at execution.  See Bryn Mawr Trust Co. v. Healy, 446

Pa. Super. at 508; Nat'l Council of Junior Order of United American Mechanics v.

Zytnick, 221 Pa. Super. 391, 392 n.1 (1972).  Similarly, appraisals are also considered by

21

bankruptcy courts in determining objections to claims and fixing allowed secured claims

under section 506(a).  See In re Petrella, 230 B.R. 829 (Bankr. N.D. Ohio 1999); In re B

& B West 164th Street Corp., 147 B.R. 832, 838 (Bankr. E.D.N.Y. 1992).

      In attempting to determine the fair market value of property, appraisals

represent expert predictions about the amount that an arms-length, commercially

reasonable sales transaction would yield in the future.  See Matter of Excello Press, Inc.,

890 F.2d 896, 905 (7th Cir. 1989).  Thus, they may be probative of value.  However, an

appraisal is not as persuasive as "[a] commercially reasonable sale of an asset [which

conclusively] establishes the market value of that asset."  In re BTS Inc., 166 F.3d 346

(Table), 1998 WL 788829, at *1 (10th Cir. 1998).  Appraisals should be relied upon,

"only when the price of such a sale cannot be got at directly."  Matter of Excello Press,

Inc., 890 F.2d at 905.  See Bryn Mawr Trust Co. v. Healy, 667 A.2d 719, 723 (Pa. Super.

Ct. 1995) (adopting sale price over sale offers and appraisal as more indicative of fair

market value).

      In this adversary proceeding, as noted earlier, Univest opted to proceed to

trial without awaiting the results of an actual sale.  Therefore, I must attempt to value the

MAV realty without relying upon the most conclusive evidence.

      The debtor contends that the amount of the MAV realty exceeds the amount

of Univest's claim and relies upon three sources for this contention.  First, he refers to the

agreement of sale for the Bennett Road realty in the amount of $475,000, dated

September 2005.  Second, he points to the March 2004 appraisal report, commissioned by

Univest, opining that the realty was worth $437,000.  Finally, the debtor relies upon his

22

own opinion of value of $475,000, based upon his knowledge of the sales of neighboring properties.

Univest discounts these three sources. It views the debtor's opinion as self-interested and speculative, the agreement of sale as highly conditional and not indicative of value, and the appraisal as based upon the doubtful premise that the realty suffers from no environmental problems. The defendant views as more probative the value of the property placed on the bankruptcy schedules by MAV: $236,000. Of course, the MAV valuation also was simply the opinion of Mr. Deltito.

In determining the value of the MAV property, I find that the debtor has offered sufficient evidence to meet any initial burden of production. That is, while I acknowledge that the plaintiff's evidence is not conclusive, it is sufficiently probative to shift the evidentiary burden back to the creditor. I further conclude that Univest has offered no evidence of any environmental contamination of the property so as to undermine the appraisal report it commissioned in March, 2004. Indeed, even its own employee, Mr. Leonard Boone, conceded at trial that he knew of no ground to question the appraisal valuation.

Therefore, given that the ultimate burden of persuasion fell upon Univest, I find for purposes of this proceeding that the value of the MAV realty is probably no less than $437,000. See generally In re Bozzelli, 227 B.R. 770, 775 (Bankr. E.D. Pa. 1998) ("Perry's appraisal is unrebutted and remains the single most persuasive evidence of record on the value of the Debtors' property."). As Univest purchased this property at a sheriff sale postpetition, and as this value exceeded the amount of its claim at the time of

23

the sale, it cannot also demand to be paid from the assets of the Deltito bankruptcy estate.[13]

Accordingly, insofar as this chapter 13 case is concerned, it shall be allowed no claim.  An appropriate order will be entered.

---

[13]This ruling may entitle other creditors to a greater distribution under chapter 13, but that issue would be addressed at confirmation.

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                    :    Chapter 13

MICHAEL B. DELTITO                       :

        Debtor                     :    Bankruptcy No. 05-11422F
_____

MICHAEL B. DELTITO                       :

        Plaintiff                  :

   v.                                    :

UNIVEST NATIONAL BANK AND                :
TRUST CO.
        Defendant                  :    Adversary No. 05-0441
_____

.................................................

ORDER

.................................................


    AND NOW, this 15th day of February 2006, for the reasons stated in the

accompanying memorandum, it is hereby ordered that the defendant's prepetition claim

has been repaid in full from its execution sale upon the real property located at 2177

Bennett Road, Philadelphia, Pennsylvania, formerly owned by MAV Associates, L.P., and

the defendant has no further claim against this chapter 13 debtor.

_____
BRUCE FOX
United States Bankruptcy Judge

copies to:

Mr. Michael B. Deltito
113 Rugby Drive
Langhorne, PA 19047

Michael H. Kaliner, Esq.
Jackson,Cook,Caracappa & Bloom
312 Oxford Valley Road
Fairless Hills, PA 19030

Amy Onder, Esq.
Wolf Block Schorr Solis-Cohen LLP
1650 Arch St. 22nd floor
Philadelphia, PA 19103-2097

William C. Miller, Esq.
Chapter 13 Trustee
111 S. Independence Mall, Suite 583
Philadelphia, PA 19106